Alan H. Weinreb, Esq. (AW 9361)
THE MARGOLIN & WEINREB LAW GROUP, LLP
165 Eileen Way, Suite 101
Syosset, New York 11791
Telephone: (516) 945-6055
Facsimile: (516) 945-6056
alan@nyfclaw.com

**14 CV - 5346**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X

BSI MORTGAGE IV LLC,

Plaintiff,

-against-

PAUL LUPO, AND JOHN DOE "1" through "12",
said persons or parties having or claimed to have a right,
title or interest in the Mortgaged premises herein, their
respective names are presently unknown to the Plaintiff,

Defendant(s).
--------------------------------------------------------------------------X

Civil Action No.:
Filed:

**VERIFIED COMPLAINT**

Plaintiff, BSI Mortgage IV LLC, ("BSI") by and through its attorneys, The Margolin &

Weinreb Law Group, LLP as and for its Verified Complaint of foreclosure of the premises and

mortgage against Defendants Paul Lupo, and John Doe "1" through "12" (collectively the

"Defendants"), respectfully alleges upon information and belief as follows:

## NATURE OF THE ACTION

1.      This is an action brought pursuant to New York Real Property Actions and

Proceedings Law, Section 1301 *et seq.*, to foreclose on a mortgage encumbering the property

commonly known as 17 Schuyler Terrace, Bronx, New York, 10465; known on the Bronx

County Tax Map as BLOCK: 5529 LOTS: 801 & 807 in the County of Bronx, and State of New

York (the "Subject Property"). The Legal Description of the property is annexed hereto as

Exhibit "A".

## PARTIES

2.      BSI is a Delaware Limited Liability Company with its usual place of business at 2500 Hallandale Beach Blvd., PH 10, Hallandale Beach, FL 33009.  BSI is a citizen of the states Delaware and Florida.

3.      Paul Lupo, upon information and belief, is a resident and citizen of Connecticut, having an address at 12 Downesbury Court, Ridgefield, Connecticut 06877.  Paul Lupo is a necessary party defendant to this action by virtue of the fact that he (i) was present at the time of the execution of the Note and Mortgage (as such terms are defined below); (ii) is the record owner of the Subject Property; (iii) is the borrower of the loan; and (iv) is the Mortgagor under the Mortgage.

4.      Upon information and belief, the John Doe Defendants are persons, parties, corporations or other entities, if any who are presently unknown to Plaintiff, holding or claiming to hold certain leaseholds, tenancies, sub-tenancies, possessory or other interests, including partnership interests, in and to any judgment or liens upon the Subject Property.

5.      Each of the above-named defendants has or claimed to have or may claim to have some interest in or lien upon said mortgaged premises or some part thereof, which interest or lien, if any, has accrued subsequent to, and is subject and subordinate to, the lien of said Mortgage.

## JURISDICTION AND VENUE

6.      This Action is between citizens of different states. The amount in controversy, exclusive of interest and costs, exceeds $75,000.00.  Therefore, jurisdiction is based upon diversity of citizenship pursuant to 28 U.S.C. §1332.

7.     Venue is deemed proper in this District pursuant to 28 U.S.C. §1391. A substantial part of the events giving rise to this action took place within the jurisdiction of this court and the Subject Property is located in this district.

## FACTUAL BACKGROUND

8.     (a) On July 1, 2009, Paul Lupo executed a Note to Michael E. Babecki for $160,000.00, and a Mortgage in the principal amount of $160,000.00 and interest to Michael E. Babecki. The applicable mortgage tax was paid. Copies of the Mortgage and Note with Allonges are annexed as Exhibits "B" and "C", respectively. Said Mortgage was recorded on July 30, 2009 in the Office of the City Register of the City of New York for the Bronx County in CRFN: 2009000236606.

(b) Said Mortgage was assigned to the Plaintiff BSI by Assignments of Mortgage as reflected in the Schedule of Assignments annexed as Exhibit "D". Copies of said Assignments of Mortgage are also annexed as Exhibit "D" respectively.

9.     Any applicable recording tax was duly paid at the time of recording said mentioned mortgage.

10.     Plaintiff is in physical possession and is the owner and holder of said Note and Mortgage.

11.     Paul Lupo, has failed to comply with the terms and provisions of the said Mortgage and said instrument(s) secured by the Mortgage, by failing to make the Monthly Payments due on the first (1st) day of March 2013 and the default continues to date.

12.     Plaintiff has complied with RPAPL 1304(2)(4), in that a 30-day notice to cure was issued on March 14, 2014 (the "Default Notice") advising of the acceleration of the loan and that by virtue of his continuing default under the Note and Mortgage, Plaintiff hereby declares

that the outstanding principal balance due under the Note, together with all accrued interest thereon is immediately due and payable. The 90-day notice provided by RPAPL 1304(1) was not required, as the borrower does not reside in the premises and it is not his principal residence. Copies of the Default Notice with proof of mailing is annexed hereto as Exhibit "E".

13.     Pursuant to RPAPL Section 1302 as amended, the plaintiff has complied with all the provisions of Section 595a and Section 6-1 of the Banking Law and RPAPL Section 1304, except where it is exempt from doing so.

14.     Plaintiff is the current owner and holder of the aforesaid Mortgage and Note.

15.     As of the date herein, Paul Lupo has failed to respond to the Default Notices.

16.     Due to the above-described default, the Defendant Paul Lupo is indebted to Plaintiff pursuant to the terms of the Note and Mortgage for:

(a)     The unpaid principal amount due under the Note, and all accrued and unpaid interest and late charges which sum as of May 1, 2014, amounts to $157,549.40 (One Hundred Fifty-Seven Thousand Five Hundred Forty-Nine Dollars and 40/100);

(b)     Attorney's fees and other costs and disbursements, payable to BSI under the terms of the Note, which will accrue until the amount due and payable under the Note is paid in full; and

(c)     Any and all additional fees that are due or may become due and payable as provided under the terms and conditions of the Note and Mortgage are paid in full.

17.     Plaintiff requests that in the event that this action will proceed to judgment of foreclosure and sale, said premises should be sold subject to the following:

a.     Any state of facts that an inspection of the premises would disclose.

b.     Any state of facts that an accurate survey of the premises would show.

    c.     Covenants, restrictions, easements and public utility agreements of record, if any.

    d.     Building and zoning ordinances of the municipality in which the Mortgaged premises are located and possible violations of same.

    e.     Any right of tenants or person in possession of the subject premises.

    f.     Any equity of redemption of the United States of America to redeem the premises with 120 days from date of sale.

    g.     Prior lien(s) of record, if any.

18.    In the event that Plaintiff possesses any other lien(s) against said mortgaged premises either by way of judgment, junior mortgage or otherwise, Plaintiff requests that such other liens(s) shall not be merged in Plaintiff's cause(s) of action set forth in this Complaint, but that Plaintiff shall be permitted to enforce said other lien(s) and/or seek determination of priority thereof in any independent action(s) or proceeding(s), including, without limitation, any surplus money proceedings.

19.    Plaintiff shall not be deemed to have waived, altered, released or changed the election hereinfore made, by reason of any payment after the commencement of this action, of any or all of the defaults mentioned herein, and such election shall continue and remain effective.

20.    No other action or proceeding has been commenced or maintained or is now pending at law or otherwise for the foreclosure of said Mortgage or for recovery of the said sum secured by said Note and Mortgage or any part thereof.

**WHEREFORE,** the Plaintiff demands judgment that the Defendant(s) and each of them and all persons claiming under them or any of them, subsequent to the commencement of this action and the filing of a notice of pendency thereof, be barred and foreclosed of and from all

estate, right, title, interest, claim, lien and equity of redemption of, in and to the said mortgaged premises and each and every part and parcel thereof; that the premises may be decreed to be sold in one parcel, according to law, subject to the terms set forth in Paragraph 17 of this complaint; that the monies arising from the sale thereof may be bought into Court; that the Plaintiff may be paid the amount due on the Note and Mortgage as hereinfore set forth, with interest and late charges to the time of such payment and the expenses of such sale, plus reasonable attorney's fees, together with the costs, allowances and disbursements of this action, and together with any sums from the dates incurred by Plaintiff pursuant to any term or provision of the Note and Mortgage set forth in this complaint, or to protect the lien of plaintiff's Mortgage, together with interest upon said sums from the dates of the respective payments and advances thereof, so far as the amount of such monies properly applicable thereto will pay the same; that this Court forthwith appoint a receiver of the rents and profits of said premises during the pendency of this action with the usual powers and duties; and that the Defendant Paul Lupo may be adjudged to pay the whole residue (unless discharged of this debt by the United States Bankruptcy Court), or so much thereof as the Court may determine to be just and equitable, of the debt remaining unsatisfied after a sale of the mortgaged premises and the application of the proceeds pursuant to the directions contained in such judgment, and that in the event that Plaintiff possesses any other lien(s) against said mortgage premises either by the way of judgment, junior mortgage or otherwise, Plaintiff requests that such other lien(s) shall not be merged in Plaintiff's cause(s) of action set forth in this complaint but that Plaintiff shall be permitted to enforce said other lien(s) and/or seek determination of priority thereof in any independent action(s) or proceeding(s), including, without limitation, any surplus money proceedings, that an order be entered

compelling that the tenants deliver possession of the premises to Plaintiff, and that the plaintiff

may have such other and further relief, or both, in the premises, as may be just and equitable.

Dated: June 30, 2014
      Syosset, New York

                           Yours, etc.
                           The Margolin & Weinreb
                           Law Group, LLP
                           Attorneys for Plaintiff

                           By: _____
                           Alan H. Weinreb, Esq. (AW 9361)
                           165 Eileen Way, Suite 101
                           Syosset, New York 11791
                           Telephone (516) 945-6055
                           Facsimile (516) 945- 6056
                           alan@nyfclaw.com

## VERIFICATION BY ATTORNEY

**ALAN H. WEINREB**, an attorney duly admitted to practice before the courts of this state and associated with the attorneys of record for the plaintiff, affirms under the penalties of perjury that: I have read the foregoing Complaint and the same is true to my own knowledge except as to matters alleged to upon information and belief as to those matters I believe them to be true. The grounds of my belief as to matters not based upon personal knowledge are communications with plaintiff or officers and/or agents of plaintiff and copies of plaintiff's records in my possession. This affirmation is made by me because plaintiff is not in a county in which my firm has its office.

Dated:  June 30, 2014
       Syosset, New York

                                       ALAN H. WEINREB (AW9361)

**EXHIBIT A**

District:                                  Title No      :
Section :                                  Title Code No: FM-1922-B
Block   :
Lot     :

## SCHEDULE A

ALL that certain plot or parcel of land, with the buildings and
improvements thereon erected, situate, lying and being in the
Borough and County of Bronx, City and State of New York, bounded
and described as follows:

BEGINNING at a point on a line (the center of a concrete wall)
running North 53 degrees 41 minutes 10 seconds East from the
easterly side of Pennyfield Avenue, as shown on the Final Maps of
the City of New York, distant 118.35 feet therefrom which point
on Pennyfield Avenue is distant 343.43 feet northerly from the
corner formed by the intersection of the said easterly side of
Pennyfield Avenue and the northerly line of Government
Reservation as shown on Section 61 of the Final Maps of the City
of New York, measured along the easterly side of Pennyfield
Avenue as the same curves;

RUNNING THENCE North 31 degrees 49 minutes 35 seconds West, 45.10
feet;

THENCE South 58 degrees 00 minutes 10 seconds West, 32.58 feet;

THENCE North 31 degrees 59 minutes 50 seconds West, 19.78 feet;

THENCE North 61 degrees 11 minutes 25 seconds East, 355.76 feet
which point is distant North 61 degrees 11 minutes 25 seconds
East, 472.33 feet from the easterly side of Pennyfield Avenue;

THENCE continuing from said point North 61 degrees 11 minutes 25
seconds East 67.67 feet to the exterior line of the water grant
made to George S. Wright dated Jan. 22, 1892;

THENCE South 33 degrees 30 minutes 50 seconds East, 11.86 feet;

THENCE South 53 degrees 41 minutes 10 seconds West, 391.77 feet
to the point or place of BEGINNING.

TOGETHER WITH the benefits and subject to the burdens of a right
of way commonly known as Schuyler Terrace as recorded in Liber
2154 page 245.

BEING and intended to be the same premises conveyed to Thomas
Taffe and Marlene Taffe by deed dated 10/19/84 recorded 11/8/84
in Reel 566 page 1697.

SAID being known as and by Block 5529 Lots 801 and 807 on the
Official Tax Map of the City of New York, Bronx, County.

**EXHIBIT B**



**NYC DEPARTMENT OF FINANCE OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

2009070800882002001EC8EB

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 21 |
|---|---|---|
| **Document ID:** 2009070800882002 | Document Date: 07-01-2009 | Preparation Date: 07-08-2009 |
| Document Type: MORTGAGE | | |
| Document Page Count: 20 | | |

| PRESENTER: | RETURN TO: |
|---|---|
| FOREMOST LAND SERVICES--PICK UP | EIAL GIRTZ PC |
| ONE BARKER AVENUE | 15 GREAT NECK ROAD, SUITE 8 |
| WHITE PLAINS, NY 10601 | GREAT NECK, NY 11021 |
| 914-993-0999 | |
| jlk619@aol.com | |

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BRONX | 5529 | 801 | Entire Lot | SCHUYLER TERRACE |
| Property Type: DWELLING ONLY - 1 FAMILY | | | | |
| Borough | Block | Lot | Unit | Address |
| BRONX | 5529 | 807 | Entire Lot | 17 SCHUYLER TERRACE |
| Property Type: DWELLING ONLY - 1 FAMILY | | | | |

**CROSS REFERENCE DATA**

CRFN ___ ___ *or* Document ID _____ *or* Year___ Reel ___ Page ___ *or* File Number __ ___

**PARTIES**

| MORTGAGOR/BORROWER: | MORTGAGEE/LENDER: |
|---|---|
| PAUL LUPO | MICHAEL E. BABECKI |
| 17 SCHUYLER TERRACE | 17 SCHUYLER TERRACE |
| BRONX, NY 10465 | BRONX, NY 10465 |

**FEES AND TAXES**

| Mortgage | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 160,000.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 160,000.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | 253.25% | | $ | 0.00 |
| TAXES: County (Basic): | $ | 800.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 1,600.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 480.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| Additional MRT: | $ | 0.00 | | | |
| TOTAL: | $ | 2,880.00 | | | |
| Recording Fee: | $ | 140.00 | | | |
| Affidavit Fee: | $ | 8.00 | | | |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**

Recorded/Filed          07-30-2009 16:09
City Register File No.(CRFN):
                                 2009000236606

*Jannette M. Hill*

*City Register Official Signature*

Old Republic National
Title # FM-1922-B

Block 5529
Lots 801 and 807
County: Bronx

After Recording Return To:

Eial Girtz PC
15 Great Neck Road, Suite 8
Great Neck, NY 11021

_____[Space Above This Line For Recording Data]_____

## MORTGAGE

### WORDS USED OFTEN IN THIS DOCUMENT

**(A)** "Security Instrument." This document, which is dated July 1, 2009, together with all Riders to this document, will be called the "Security Instrument."

**"Borrower."** Paul Lupo, whose address is 17 Schuyler Terrace, Bronx, NY 10465 sometimes will be called "Borrower" and sometimes simply "I" or "me."

**"Lender."** Michael E. Babecki will be called "Lender." Lender is a corporation or association which exists under the laws of. Lender's address is 17 Schuyler Terrace, Bronx, NY 10465.

**"Note."** The note signed by Borrower and dated July 1, 2009, will be called the "Note." The Note shows that I owe Lender One Hundred and Sixty Thousand Dollars (U.S. $160,000.00) plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to pay the debt in full by July 1, 2029.

**(B)** "Property." The property that is described below in the section titled "Description of the Property," will be called the "Property."

**(C)** "Loan." The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(D)** "Sums Secured." The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

**(E)** "**Riders.**" All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
☐ Balloon Rider ☐ Planned Unit Development Rider ☐ Other(s) [specify] _____
☐ 1-4 Family Rider ☐ Biweekly Payment Rider

**(I)** "**Applicable Law.**" All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

**(J)** "**Community Association Dues, Fees, and Assessments.**" All dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

**(K)** "**Electronic Funds Transfer.**" "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** "**Escrow Items.**" Those items that are described in Section 3 will be called "Escrow Items."

**(M)** "**Miscellaneous Proceeds.**" "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds, as defined in, and paid under the coverage described in, Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

**(N)** "**Mortgage Insurance.**" "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** "**Periodic Payment.**" The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

**(P)** "**RESPA.**" "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY**

I mortgage, grant and convey the Property to Lender subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A)     Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

(B)     Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C)     Keep all of my other promises and agreements under this Security Instrument and the Note.

**DESCRIPTION OF THE PROPERTY**

I give Lender rights in the Property described in (A) through (G) below:

(A)     The Property which is located at 17 Schuyler Terrace, Bronx, NY 10465
This Property is in Bronx County. It has the following legal description:

SEE ATTACHED SCHDULE A

(B)     All buildings and other improvements that are located on the Property described in subsection (A) of this section;

(C)     All rights in other property that I have as owner of the Property described in subsection (A) of this section.  These rights are known as "easements and appurtenances attached to the Property;"

(D)     All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

(E)     All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F)     All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G)     All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

```
District:                           Title No      :
Section :                           Title Code No: FM-1922-B
Block   :
Lot     :
```

## SCHEDULE A

ALL that certain plot or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough and County of Bronx, City and State of New York, bounded and described as follows:

BEGINNING at a point on a line (the center of a concrete wall) running North 53 degrees 41 minutes 10 seconds East from the easterly side of Pennyfield Avenue, as shown on the Final Maps of the City of New York, distant 118.35 feet therefrom which point on Pennyfield Avenue is distant 343.43 feet northerly from the corner formed by the intersection of the said easterly side of Pennyfield Avenue and the northerly line of Government Reservation as shown on Section 61 of the Final Maps of the City of New York, measured along the easterly side of Pennyfield Avenue as the same curves;

RUNNING THENCE North 31 degrees 49 minutes 35 seconds West, 45.10 feet;

THENCE South 58 degrees 00 minutes 10 seconds West, 32.58 feet;

THENCE North 31 degrees 59 minutes 50 seconds West, 19.78 feet;

THENCE North 61 degrees 11 minutes 25 seconds East, 355.76 feet which point is distant North 61 degrees 11 minutes 25 seconds East, 472.33 feet from the easterly side of Pennyfield Avenue;

THENCE continuing from said point North 61 degrees 11 minutes 25 seconds East 67.67 feet to the exterior line of the water grant made to George S. Wright dated Jan. 22, 1892;

THENCE South 33 degrees 30 minutes 50 seconds East, 11.86 feet;

THENCE South 53 degrees 41 minutes 10 seconds West, 391.77 feet to the point or place of BEGINNING.

TOGETHER WITH the benefits and subject to the burdens of a right of way commonly known as Schuyler Terrace as recorded in Liber 2154 page 245.

BEING and intended to be the same premises conveyed to Thomas Taffe and Marlene Taffe by deed dated 10/19/84 recorded 11/8/84 in Reel 566 page 1697.

SAID being known as and by Block 5529 Lots 801 and 807 on the Official Tax Map of the City of New York, Bronx, County.

**BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

**PLAIN LANGUAGE SECURITY INSTRUMENT**

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

**COVENANTS**

I promise and I agree with Lender as follows:

1. **Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

2.      **Application of Borrower's Payments and Insurance Proceeds.**   Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to pay interest due under the Note;

Next, to pay principal due under the Note; and

Next, to pay the amounts due Lender under Section 3 of this Security Instrument.

Such payments will be applied to each Periodic Payment in the order in which it became due.

Any remaining amounts will be applied as follows:

First, to pay any late charges;

Next, to pay any other amounts due under this Security Instrument; and

Next, to reduce the principal balance of the Note.

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

3.      **Monthly Payments For Taxes And Insurance.**

(a)      **Borrower's Obligations.** I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1)      The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a Lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2)      The leasehold payments or ground rents on the Property (if any);

(3)      The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4)      The premium for Mortgage Insurance (if any);

(5)      The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6)      If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

(b)   **Lender's Obligations.**   Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

(c)   **Adjustments to the Escrow Funds.** Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

4.    **Borrower's Obligation to Pay Charges, Assessments And Claims.** I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if:  (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security Instrument is superior to the Lien held by that Person. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

5.    **Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges

each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain

after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.     **Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

7.     **Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

(a)     **Maintenance and Protection of the Property.** I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as defined in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

(b)     **Lender's Inspection of Property.** Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

8.     **Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information),

Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

**9.     Lender's Right to Protect Its Rights in The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture (as defined in Section 11), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to:  (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so.  I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9.  I will pay those amounts to Lender when Lender sends me a notice requesting that I do so.  I will pay interest on those amounts at the interest rate set forth in the Note.  Interest on each amount will begin on the date that the amount is spent by Lender.  This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease.  I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

**10.     Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance.  If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer.  However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage.  I will continue to pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect).  Lender will

retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or any other entity, may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance."

It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has – if any – regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

11.  **Agreements About Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an

opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full (as defined in Section 22). The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**12. Continuation of Borrower's Obligations And of Lender's Rights.**

(a)     **Borrower's Obligations.** Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

(b)     **Lender's Rights.** Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.** If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

**14. Loan Charges.** Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

15. **Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

18. **Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may

require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19.    Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the following conditions:

(a)    I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

(b)    I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(c)    I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(d)    I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

**20.    Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required

by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If Applicable Law provides a time period which will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

21.     **Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law.   An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the

Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

## NON-UNIFORM COVENANTS

I also promise and agree with Lender as follows:

22.     **Lender's Rights If Borrower Fails to Keep Promises and Agreements. Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."**

**If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another Person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.**

**Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:**

(a)     **I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;**

(b)     **Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:**

(1)     **The promise or agreement that I failed to keep or the default that has occurred;**

(2)     **The action that I must take to correct that default;**

(3)     **A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;**

(4)     **That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;**

(5)     **That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security**

Case 1:14-cv-05346-ALC   Document 1   Filed 07/16/14   Page 31 of 52

Instrument remain fully effective as if Immediate Payment in Full had never been required; and

(6)     That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

(c)     I do not correct the default stated in the notice from Lender by the date stated in that notice.

23.     **Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

24.     **Agreements about New York Lien Law.** I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

25.     **Borrower's Statement Regarding the Property [check box as applicable].**

☑     This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

☐     This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

☐     This Security Instrument does not cover real property improved as described above.

SIGNATURE PAGE TO FOLLOW

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 19 of this Security Instrument and in any Rider signed by me and recorded with it.

Witnesses:

_____    _Paul Lupo_____ (Seal)
                                 PAUL LUPO - Borrower


_____    _____ (Seal)
                                                      - Borrower

_____[Space Below This Line For Acknowledgment]_____

STATE OF NEW YORK          )
                           ) ss:
COUNTY OF BRONX            )

On the 1st Day of July, 2009 before me, the undersigned, a Notary Public in and for said State, personally appeared, Paul Lupo, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____   **SEAL**
          Notary Public

LAURA N. KAUFMAN
Notary Public, State of New York
No. 4858411
Qualified in Westchester County
Commission Expires May 6, 2010

**EXHIBIT C**

**NOTE**

July 1, 2009                                                                                    Bronx, NY

17 Schuyler Terrace, Bronx, NY [Property Address]

1.      **BORROWER'S PROMISE TO PAY**

   In return for a loan that I have received, I promise to pay U.S. $160,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Michael E. Babecki. I will make all payments under this Note in the form of cash, check or money order.

   I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

2.      **INTEREST**

   Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 5%.

   The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

3.      **PAYMENTS**

   **(A)      Time and Place of Payments**

   I will pay principal and interest by making a payment every month.

   I will make my monthly payment on the 1st day of each month beginning on August 1, 2009. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on July 1, 2029, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

   I will make my monthly payments at 516 Main Street, Duke Center, PA 46729 or at a different place if required by the Note Holder.

   **(B)      Amount of Monthly Payments**

   My monthly payment will be in the amount of U.S. $1,056.00.

4.      **BORROWER'S RIGHT TO PREPAY**

   I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

   I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

5.      **LOAN CHARGES**

   If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then:  (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

6.      **BORROWER'S FAILURE TO PAY AS REQUIRED**

   **(A)      Late Charge for Overdue Payments**

   If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 2% of

my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)     Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)     Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)     No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)     Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7.     GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.     OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.     WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.     UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3200   1/01   *(page 2 of 3 pages)*

invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
PAUL LUPO                                                  - Borrower

_____ (Seal)
                                                                     - Borrower

_____ (Seal)
                                                                     - Borrower

*[Sign Original Only]*

MULTISTATE FIXED RATE NOTE--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3100    1/01    *(page 3 of 3 pages)*

Endorsement:

_Michael Z Barber_

### Allonge to Promissory Note

Date of Note: July 1, 2009
Original Principal Amount of Note: $160,000.00
Maker of Note: Paul Lupo

### ALLONGE

Pursuant to this **ALLONGE** ("Allonge"), **CHRISTINE TYLER**, ("Assignor"), hereby assigns and endorses to;

**BSI MORTGAGE IV LLC**, with an address at 2500 Hallandale Beach Blvd, Hallandale Beach, FL, 33009 ("Assignee"), its successors and/or assigns ATIMA, that certain Promissory Note dated July 1, 2009, executed by Paul Lupo, as maker, in favor of Michael E. Babecki, as payee, in the original principal amount of $160,000.00 ("Note"), the original of said Note being attached hereto and made a part hereof.

The Note is hereby endorsed as follows:

"Pay to the order of **BSI MORTGAGE IV LLC**, its successors and/or assigns as their interests may appear, **WITHOUT RECOURSE**, representation or warranty of any kind."

Assignor represents that it is the holder of the note and has the power and authority to assign the same.

The foregoing endorsement shall have the same effect as though it were written directly on the Note.

This Allonge is made **WITHOUT RECOURSE** and without any representations or warranties, express or implied.

Dated: May 14, 2014

**CHRISTINE TYLER**

*Christine Tyler*

**EXHIBIT D**

**Assignment of Mortgage:**

Assignor:      Michael E. Babecki

Assignee:      Christine Tyler

Dated:         7/01/2009

**Assignment of Mortgage:**

Assignor:      Christine Tyler

Assignee:      BSI Mortgage IV LLC

Dated:         05/06/2014



**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

2009070800882003001E08D6

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 4 |
|---|---|

| Document ID: 2009070800882003 | Document Date: 07-01-2009 | Preparation Date: 07-08-2009 |
|---|---|---|

Document Type: ASSIGNMENT, MORTGAGE
Document Page Count: 3

| PRESENTER: | RETURN TO: |
|---|---|
| FOREMOST LAND SERVICES--PICK UP | JOHN KAUFMAN, ESQ. |
| ONE BARKER AVENUE | CANAVAN & KAUFMAN |
| WHITE PLAINS, NY 10601 | ONE BARKER AVENUE |
| 914-993-0999 | WHITE PLAINS, NY 10601 |
| jlk619@aol.com | 914-993-0700 |

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BRONX | 5529 | 801 | Entire Lot | SCHUYLER TERRACE |

Property Type: DWELLING ONLY - 1 FAMILY

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BRONX | 5529 | 807 | Entire Lot | 17 SCHUYLER TERRACE |

Property Type: DWELLING ONLY - 1 FAMILY

**CROSS REFERENCE DATA**

Document ID: 2009070800882002

**PARTIES**

| ASSIGNOR/OLD LENDER: | ASSIGNEE/NEW LENDER: |
|---|---|
| MICHAEL E. BABECKI | CHRISTINE TYLER |
| 17 SCHUYLER TERRACE | 516 MAIN STREET |
| BRONX, NY 10465 | DUKE CENTER, PA 16729 |

**FEES AND TAXES**

| Mortgage | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | | |
| MTA: | $ | 0.00 | |
| NYCTA: | $ | 0.00 | |
| Additional MRT: | $ | 0.00 | |
| TOTAL: | $ | 0.00 | |
| Recording Fee: | $ | 55.00 | |
| Affidavit Fee: | $ | 0.00 | |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**

Recorded/Filed        07-30-2009 16:09
City Register File No.(CRFN):
2009000236607

*Gnaette M Hill*

*City Register Official Signature*

*Old Republic National
Title # FM - 1922-B
Block  5529
Lots  801 and 807
County: Bronx*

— Assignment of Mortgage without Covenant — Individual or Corporation (single sheet)

CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT—THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY

MᵇB

**KNOW THAT** Michael E. Babecki, of 77 Schuyler Terrace, Bronx, NY 10465                                                                 , assignor,

in consideration of Ten————————————————————————————— dollars ($ 10.00                 ),

paid by Christine Tyler of 516 Main Street, Oche Center, 16729 PA                                                                          , assignee,

hereby assigns unto the assignee,

Mortgage dated the 1     day of July                           , in the year 2008   , made by

Paul Lupo

To

Michael E. Babecki

in the principal sum of $ 160,000.00        and recorded on the      day of    *Simultaneously herewith*   in the year 2009

in Liber        of Section        of Mortgages, page        , in the office of the Register

of The Bronx County        covering premises 77 Schuyler Terrace, Bronx, NY

TOGETHER with the bond(s) or note(s) or obligation(s) described in said mortgage(s), and the moneys due and to grow due
thereon with the interest; TO HAVE AND TO HOLD the same unto the assignee and to the successors, legal representatives and
assigns of the assignee forever.
The assignee is not acting as a nominee of the mortgagor and that the mortgage continues
to secure a bona fide obligation.
The word "assignor" or "assignee" shall be construed as if it read "assignors" or "assignees" whenever the sense of this
instrument so requires.
IN WITNESS WHEREOF, the assignor has duly executed this assignment the 1ˢᵗ  day of July        , in the year 2009

IN PRESENCE OF:

*Michael E Babecki*

MICHAEL E. BABECKI

District:
Section :
Block   :
Lot     :

Title No     :
Title Code No: FM-1922-B

SCHEDULE A

ALL that certain plot or parcel of land, with the buildings and
improvements thereon erected, situate, lying and being in the
Borough and County of Bronx, City and State of New York, bounded
and described as follows:

BEGINNING at a point on a line (the center of a concrete wall)
running North 53 degrees 41 minutes 10 seconds East from the
easterly side of Pennyfield Avenue, as shown on the Final Maps of
the City of New York, distant 118.35 feet therefrom which point
on Pennyfield Avenue is distant 343.43 feet northerly from the
corner formed by the intersection of the said easterly side of
Pennyfield Avenue and the northerly line of Government
Reservation as shown on Section 61 of the Final Maps of the City
of New York, measured along the easterly side of Pennyfield
Avenue as the same curves;

RUNNING THENCE North 31 degrees 49 minutes 35 seconds West, 45.10
feet;

THENCE South 58 degrees 00 minutes 10 seconds West, 32.58 feet;

THENCE North 31 degrees 59 minutes 50 seconds West, 19.78 feet;

THENCE North 61 degrees 11 minutes 25 seconds East, 355.76 feet
which point is distant North 61 degrees 11 minutes 25 seconds
East, 472.33 feet from the easterly side of Pennyfield Avenue;

THENCE continuing from said point North 61 degrees 11 minutes 25
seconds East 67.67 feet to the exterior line of the water grant
made to George S. Wright dated Jan. 22, 1892;

THENCE South 33 degrees 30 minutes 50 seconds East, 11.86 feet;

THENCE South 53 degrees 41 minutes 10 seconds West, 391.77 feet
to the point or place of BEGINNING.

TOGETHER WITH the benefits and subject to the burdens of a right
of way commonly known as Schuyler Terrace as recorded in Liber
2154 page 245.

BEING and intended to be the same premises conveyed to Thomas
Taffe and Marlene Taffe by deed dated 10/19/84 recorded 11/8/84
in Reel 566 page 1697.

SAID being known as and by Block 5529 Lots 801 and 807 on the
Official Tax Map of the City of New York, Bronx, County.

| ACKNOWLEDGEMENT TAKEN IN NEW YORK STATE | ACKNOWLEDGEMENT TAKEN IN NEW YORK STATE |
|---|---|

State of New York, County of _Bronx_ ss:

On the 1st day of _July_ in the year 2008 before me, the undersigned, personally appeared _Michael E. Babecki_ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

**SEAL**

LAURA M. KAUFMAN
Notary Public, State of New York
No. 4896411

### ACKNOWLEDGEMENT BY SUBSCRIBING WITNESS TAKEN IN NEW YORK STATE

LAURA M. KAUFMAN
Notary Public, State of New York
No. 4896411
Qualified in Westchester Co.
Commission Expires May 25, 2010

**SEAL**

State of New York, County of _____ ss:
On the _____ day of _____ in the year _____ before me, the undersigned, a Notary Public in and for said State, personally appeared

_____ the subscribing witness to the foregoing instrument, with whom I am personally acquainted, who, being by me duly sworn, did depose and say that he/she/they reside(s) in

(if the place of residence is in a city, include the street and street number if any, thereof), that he/she/they know(s)

to be the individual described in and who executed the foregoing instrument; that said subscribing witness was present and saw said

execute the same; and that said witness at the same time subscribed his/her/their name(s) as a witness thereto

---

State of New York, County of _____ ss:

On the _____ day of _____ in the year _____ before me, the undersigned, personally appeared

_____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

### ACKNOWLEDGEMENT TAKEN OUTSIDE NEW YORK STATE

*State of _____, County of _____ ss:
*(Or insert District of Columbia, Territory, Possession or Foreign County)

On the _____ day of _____ in the year _____ before me, the undersigned, personally appeared

_____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), that by his/her/their signature(s) on the instrument, the individual(s) or the persons upon behalf of which the individual(s) acted, executed the instrument, and that such individual make such appearance before the undersigned in the

(add the city or political subdivision and the state or country or other place the acknowledgement was taken).

---

### Assignment of Mortgage
### without Covenant

Title No. _Old Republic National Title # FM-1922-B_

_Michael E. Babecki_
TO
_Christine Tyler_

SECTION.
BLOCK: 5529
LOT: 801 and 807
COUNTY OR TOWN _Bronx_

| DISTRIBUTED BY | RETURN BY MAIL TO: |
|---|---|

YOUR TITLE EXPERTS
The Judicial Title Insurance Agency LLC
800-281-TITLE (8485) FAX: 800-FAX-9396

Rial Girtz, PC
15 Great Neck Rd Suite 8
Great Neck, NY 11021

## ASSIGNMENT OF MORTGAGE

**When Recorded Return To:**
BSI Mortgage IV LLC
2500 Hallandale Beach Blvd
Hallandale Beach, FL, 33009

Borrower: Paul Lupo
Address:  17 Schuyler Terrace, Bronx, New York
County of: Bronx

**FOR VALUE RECEIVED**, the undersigned ("Assignor") hereby assigns and transfers to **BSI MORTGAGE IV LLC**, with an address at 2500 Hallandale Beach Blvd, Hallandale Beach, FL, 33009, its successors and/or assigns ATIMA ("Assignee"), and other good and valuable consideration, receipt of which is hereby acknowledged, together with the bond(s), note(s), or other obligation(s) described in said mortgages, and the monies due thereon with any interest.

**WITHOUT RECOURSE**, the following Mortgage(s) (See Exhibit 'A' Attached.) are assigned and the assignment is being made without representation or warranty, express or implied, except as set forth herein.

**IN WITNESS WHEREOF**, the undersigned has executed this Assignment of Mortgage, as of May __6__ , 2014.

**CHRISTINE TYLER**

*Christine Tyler*

## ACKNOWLEDGEMENT

State of *Pennsylvania*:
County of *McKean*  :     **ss:**

On the __6th__ day of May in the year 2014 before me, the undersigned, a Notary Public in and for said State, personally appeared Christine Tyler, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Katina L. Phillips, Notary Public
City of Bradford, McKean County
My Commission Expires Sept. 9, 2016
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

## Exhibit "A"

Mortgage
| | |
|---|---|
| Mortgagor: | Paul Lupo |
| Mortgagee: | Michael E. Babecki |
| Amount: | $160,000.00 |
| Dated: | 07/01/2009 |
| Recorded: | 07/30/2009 |
| CRFN: | 2009000236606 |

Assignment of Mortgage
| | |
|---|---|
| Assignor: | Michael E. Babecki |
| Assignee: | Christine Tyler |
| Dated: | 07/01/2009 |
| Recorded: | 07/30/2009 |
| CRFN: | 2009000236607 |

District:                                    Title No      :
Section :                                    Title Code No: FM-1922-B
Block   :
Lot     :

## SCHEDULE A

ALL that certain plot or parcel of land, with the buildings and
improvements thereon erected, situate, lying and being in the
Borough and County of Bronx, City and State of New York, bounded
and described as follows:

BEGINNING at a point on a line (the center of a concrete wall)
running North 53 degrees 41 minutes 10 seconds East from the
easterly side of Pennyfield Avenue, as shown on the Final Maps of
the City of New York, distant 118.35 feet therefrom which point
on Pennyfield Avenue is distant 343.43 feet northerly from the
corner formed by the intersection of the said easterly side of
Pennyfield Avenue and the northerly line of Government
Reservation as shown on Section 61 of the Final Maps of the City
of New York, measured along the easterly side of Pennyfield
Avenue as the same curves;

RUNNING THENCE North 31 degrees 49 minutes 35 seconds West, 45.10
feet;

THENCE South 58 degrees 00 minutes 10 seconds West, 32.58 feet;

THENCE North 31 degrees 59 minutes 50 seconds West, 19.78 feet;

THENCE North 61 degrees 11 minutes 25 seconds East, 355.76 feet
which point is distant North 61 degrees 11 minutes 25 seconds
East, 472.33 feet from the easterly side of Pennyfield Avenue;

THENCE continuing from said point North 61 degrees 11 minutes 25
seconds East 67.67 feet to the exterior line of the water grant
made to George S. Wright dated Jan. 22, 1892;

THENCE South 33 degrees 30 minutes 50 seconds East, 11.86 feet;

THENCE South 53 degrees 41 minutes 10 seconds West, 391.77 feet
to the point or place of BEGINNING.

TOGETHER WITH the benefits and subject to the burdens of a right
of way commonly known as Schuyler Terrace as recorded in Liber
2154 page 245.

BEING and intended to be the same premises conveyed to Thomas
Taffe and Marlene Taffe by deed dated 10/19/84 recorded 11/8/84
in Reel 566 page 1697.

SAID being known as and by Block 5529 Lots 801 and 807 on the
Official Tax Map of the City of New York, Bronx, County.

# EXHIBIT E

# THE MARGOLIN & WEINREB LAW GROUP, LLP

Attorneys at Law
165 Eileen Way, Suite 101
Syosset, New York 11791

ALAN WEINREB, ESQ.
C. LANCE MARGOLIN, ESQ.

Cynthia A. Nierer, Esq., Managing Attorney

(516) 921-3838
FAX  (516) 921-3824
(516) 945-6055
FAX  (516) 945-6056
www.nyfclaw.com

**We are a debt collector and are attempting to collect a debt. Any information obtained will be used for that purpose.**

NOTICE OF DEFAULT

via first class mail and via certified mail (return receipt requested)

May 14, 2014

Paul Lupo
17 Schuyler Terrace          7013 1090 0000 6017 5543
Bronx, NY 10465,

Paul Lupo
12 Downesbury Court          7013 1090 0000 6017 5697
Ridgefield CT  06877

RE:    PROPERTY:  17 Schuyler Terrace, Bronx, NY 10465, Bronx

AVISO IMPORTANTE PARA PERSONAS DE HABLA HISPANA:  Esta notificacion es de suma importancia.  Puede afectar su derecho a continuar viviendo in su casa.  Si no entiende el contenido, obtenga una traduccion immediatamente.

Dear Borrower:

**You are hereby notified that this letter is an attempt to collect a debt. All information obtained will be used for that purpose.** This firm has been designated by BSI Mortgage IV LLC, the Servicer and the Creditor of the above-referenced loan (hereinafter referred to as "the Debt") to contact you regarding the status of your account. The Creditor (also called the Holder and Beneficiary) has authorized the Servicer and this firm to act on its behalf regarding the collection of the Debt. This firm is relying on information provided by such entities. **Further notification pursuant to the Fair Debt Collection Practices Act is provided further down.**

The originating creditor of your loan is Michael E Babecki.  Should you have any questions to our firm, The Margolin & Weinreb Law Group, LLP, please contact us at 516-921-3838.

Page Three

## NOTICE PURSUANT TO FAIR DEBT COLLECTION PRACTICES ACT

1. **The total amount of the Debt: $157,549.40 . Remaining principal balance as of May 14, 2014 is $141,710.45 plus unpaid accrued interest of $15,838.95.**

2. **Name of the creditor to whom the Debt is owed: BSI Mortgage IV LLC**

3. **Unless you dispute the validity of the Debt or any portion thereof within thirty (30) days after receipt of this Notice, we will assume that the Debt is valid.**

4. **If you notify us in writing within thirty (30) days after receipt of this Notice that the Debt or any portion thereof is disputed, we will obtain verification of the Debt or a copy of any judgment against you representing the Debt and a copy of such verification or judgment will be mailed to you from our office.**

5. **Upon request in writing within thirty (30) days after receipt of this Notice, we will provide you with the name and address of the original creditor, if different from the current creditor.**

**In the event that there is a manufactured house on the subject premises, should you be unable to bring your account current within thirty (30) days, it is hereby demanded that you turn same over to the Creditor.**

**Failure to being the loan current or turn over the above referenced manufactured home within thirty (30) days will be deemed a refusal to comply with the terms of this demand.**

**All communication about this matter must be made through BSI Mortgage IV, LLC except those specified in this letter.**

All payments must be made in **certified funds, cashier's check or money order(s)** payable to and mailed BSI Mortgage IV, LLC, 101 N.E. 3rd St., Suite 1250, Fort Lauderdale, FL 33301.

If you are unable to bring your account current, you are urged to call Bank of Camden immediately to discuss possible alternatives to foreclosure.

Respectfully,
The Margolin & Weinreb Law Group, LLP


Cc: BSI Mortgage IV LLC

Page Two

As of June 13, 2014, the following sums are in arrears:

Total Arrears                    $15,838.95

On or before June 12, 2014, you must submit payment by bank check, money order, or certified funds of the total arrears to: BSI Mortgage IV, LLC, 101 N.E. 3rd St., Suite 1250, Fort Lauderdale, FL 33301. Any payment(s) and late charge(s), that come due in the interim must also be included. Prior to submitting payment, you may wish to call BSI Mortgage IV LLC to verify the exact amount.

Failure to correct the default by June 12, 2014 will result in acceleration of your loan. Upon acceleration, the total amount of the debt will be immediately due and payable without further demand and a lawsuit to foreclose the mortgage may be commenced. In foreclosure proceedings, we are entitled to collect the total debt in addition to any expenses and costs of the foreclosure including but not limited to reasonable attorneys' fees, where so provided by the terms of the mortgage. If your loan has already been accelerated and foreclosure proceedings already begun, we will continue the foreclosure where possible. Creditor or another person may acquire the Property by means of foreclosure and sale. You have the right to assert in court the non-existence of a default, that you kept your promises and agreements under the mortgage and note or any other defense. After acceleration of the debt, but prior to the foreclosure sale, you may have the right to reinstate the mortgage loan, by payment of all sums due as if immediate payment in full had not been required and to have the lawsuit discontinued, depending on the terms of the note and mortgage. We encourage you to review the provisions of the note and mortgage.

If you have obtained an order of discharge from the Bankruptcy court, which includes this debt, and you have not reaffirmed your liability for this debt, this law firm is not alleging that you have any personal liability for this debt and does not seek a money judgment against you. However, even if a discharge has been obtained, proceedings to foreclose the loan may still be brought.

IMPORTANT NOTICE TO SERVICEMEMBER AND THEIR DEPENDENTS
If you are a servicemember who is, or recently was, on "active duty" or "active service", or a dependent of such a servicemember, you may be entitled to certain legal rights and protections, including protection from foreclosure or eviction, pursuant to the Servicemembers Civil Relief Act (50 USC App. §§501-596), as amended (the SCRA) and possibly, certain similar state statutes. If you believe you may be entitled to rights and protections under SCRA, please contact us at 516-945-6055.

**If at any time, you make a request to this law firm not to be contacted by phone, we will not do so, except by legal action. NO PERSON IN THIS LAW OFFICE WILL GIVE YOU ANY LEGAL ADVICE.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
BSI MORTGAGE IV LLC,

                                        Plaintiff,


            -against-

PAUL LUPO, N.A. AND JOHN DOE "1" through "12",
said persons or parties having or claimed to have a right,
title or interest in the Mortgaged premises herein, their
respective names are presently unknown to the Plaintiff,

                                        Defendant(s).
-------------------------------------------------------------------------X


## VERIFIED COMPLAINT


THE MARGOLIN & WEINREB LAW GROUP, LLP
Attorneys for Plaintiff
165 Eileen Way, Suite 101
Syosset, New York 11791
Telephone (516) 945-6055
Facsimile (516) 945- 6056
alan@nyfclaw.com